IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 18-cv-01461-REB-NRN

LOGAN BALL,
ELIZABETH BALL,
HANG SIK KIM,
HYUN AH KIM,
ESTATE OF SARAH BALL, and
ESTATE OF PETER KIM,

Plaintiffs,

v.

UNITED STATES OF AMERICA,

Defendant.

---

**REPORT AND RECOMMENDATION ON
DEFENDANT UNITED STATES OF AMERICA'S MOTION TO DISMISS
(DKT. #26)**

---

**N. Reid Neureiter
United States Magistrate Judge**

Presently before the Court is Defendant United States of America's ("United States") Motion to Dismiss (the "Motion") (Dkt. #26), which Judge Robert E. Blackburn referred to the undersigned magistrate judge on August 28, 2018. (Dkt. #27.) On September 17, 2018, Plaintiffs Logan Ball, Elizabeth Ball, Hang Sik Kim, Hyun Ah Kim, Estate of Sarah Ball, and Estate of Peter Kim (the "Plaintiffs") filed a Response (Dkt. #33) and an Errata to the Response (Dkt. #34), and on October 1, 2018, the United States filed a Reply. (Dkt. #40.) The Court heard argument on the Motion on October 23, 2018. (Dkt. #43.) The Court has taken judicial notice of the Court's file and has

considered the applicable Federal Rules of Civil Procedure and case law. The Court, now being fully informed, makes the following recommendation.

## I. BACKGROUND

In the early morning hours of June 12, 2016, Sarah Ball, 18, and Peter Kim, 19, were killed when Isaac Lutz drove the vehicle in which the three were riding into an exposed, abandoned mine shaft (the "Mine Shaft"). (Complaint ("Compl."), Dkt. #1 ¶¶ 22-24.) Just before the accident, the vehicle had been traveling on U.S. Forest Service Road 456.1A ("456.1A"), located in in unincorporated Boulder County, Colorado, west of the town of Gold Hill, Colorado. (*Id.* ¶¶ 30-31.) The United States Forest Service ("USFS") owns the land where the Mine Shaft is located and is responsible for the maintenance of 456.1A. (*Id.* ¶¶ 27, 35.) The Mine Shaft, known variously as "The Gold Hill Mine Shaft," "2810146144331100," or "461-4433-1.100," was at least several decades old at the time of the accident. (*Id.* ¶¶ 25, 27.) The Mine Shaft was approximately ten feet by twenty feet in diameter and approximately 22 to 25 feet deep. (*Id.* ¶¶ 57-58.) The Complaint alleges that there is a fork in 456.1A east of the Mine Shaft that divides the road into a north and south fork. The North Fork "leads to a continuation of 456.1A and is the correct Forest Service road." (*Id.* ¶ 41.) The North Fork was narrower than the South Fork and was partially blocked by tree limbs located six to eight feet above the road. (*Id.* ¶¶ 42-43). Plaintiffs allege that drivers travelling west along 456.1A would likely assume the South Fork was the correct route due to its width and lack of obstructing tree limbs relative to the North Fork. But the South Fork instead led up and over a mound of dirt and down into the gaping opening of the Mine Shaft. (*Id.* ¶¶ 41, 44.)

On June 11, 2018, the parents of Ms. Ball and Mr. Kim and the decedents' estates (collectively "Plaintiffs") filed suit against the United States and the Colorado Division of Reclamation, Mining, and Safety ("CDRMS"). [1] Plaintiffs assert claims for negligence, premises liability, wrongful death, and a survival action.[2] Specifically, the Complaint alleges that "[e]ven though the United States was aware of the hazardous condition of the Mine Shaft before the Accident, it neither abated the hazard by filling in the Mine Shaft, nor did it warn or guard against the known danger of the Mine Shaft." (*Id.* ¶ 53.)

In the Motion, the United States argues that Plaintiffs' Complaint should be dismissed for lack of subject matter jurisdiction for either of two reasons. First, the United States claims that the Court lacks subject matter jurisdiction over Plaintiffs' Federal Tort Claims Act claims, 28 U.S.C. §§ 1346(b), 2671–80 ("FTCA"), under the doctrine of sovereign immunity. Second, the United States asserts that it is immune from tort liability under the Colorado Recreational Use Statute, Colo. Rev. Stat. §§ 33-41-101–106 (the "CRUS"), because the United States is a property owner that allowed its land to be used by the public for recreational purposes. The Court will address these arguments in turn.

## II. LEGAL STANDARD

The United States moves to dismiss under Rule 12(b)(1) for lack of subject matter jurisdiction. These types of motions generally take two forms: facial attacks or

---

[1] Judge Blackburn dismissed Plaintiffs' claims against CDRMS after Plaintiffs confessed CDRMS's Motion to Dismiss. (Dkt. #45.) The only remaining defendant is the United States.
[2] In their Response, Plaintiffs stipulate to the dismissal of the negligence claim. (Dkt. #33 at 15.)

factual attacks. *Ruiz v. McDonnell*, 299 F.3d 1173, 1180 (10th Cir. 2002). A facial attack questions the sufficiency of a complaint, and the allegations in the complaint are accepted as true. *Id.* In a factual attack, the movant goes beyond the allegations in the complaint and challenges the facts upon which subject-matter jurisdiction depends. In a factual attack, the Court must look beyond the complaint and has wide discretion to consider documentary and even testimonial evidence. *Sizova v. Nat'l Inst. of Standards & Tech.*, 282 F.3d 1320, 1324 (10th Cir. 2002).

The United States launches both a facial attack and a factual attack on Plaintiffs' Complaint. It asserts a factual challenge as to whether Plaintiffs' tort claims meet the discretionary function exception to the FTCA's waiver of sovereign immunity. Accordingly, with regard to this issue, the Court can refer to evidence outside the pleadings in resolving the disputed jurisdictional facts. *Holt v. United States*, 46 F.3d 1000, 1003 (10th Cir. 1995).[3] The United States also mounts a facial challenge under the CRUS, and the Court will therefore accept Plaintiffs' allegations as true when

---

[3] While a court's reference to materials outside the complaint in resolving a Rule 12(b)(1) motion will not ordinarily result in converting the motion to one for summary judgment under Rule 56, it must convert the motion when resolution of the jurisdictional question is intertwined with the merits of the case. *See Holt*, 46 F.3d at 1003. The Court notes that Plaintiffs do not argue that the Court should apply the summary-judgment standard, and neither party points to specific disputes of material fact involving merits issues that require resolution under a summary-judgment analysis. *See Clark v. United States*, 695 F. App'x 378, n.2 (10th Cir. 2017) (recognizing that these are relevant factors to consider when deciding a Rule 12(b)(1) motion). Moreover, applying a Rule 12(b)(6) or Rule 56 standard, i.e., construing all the facts in the record and reasonable inferences drawn therefrom in a light most favorable to Plaintiffs, does not materially affect the Court's analysis. *See Lopez v. United States*, 376 F.3d 1055, 1061 (10th Cir. 2004) (rejecting plaintiffs' argument that district court should have converted Rule 12(b)(1) motion into motion to dismiss or for summary judgment where, among other things, even drawing all inferences in plaintiffs' favor, the discretionary function exception applied).

4

addressing this issue. Given the differing legal standards applicable to the United States' jurisdictional challenges, the Court will address specific allegations and facts as they arise in relation to these two different arguments.

## III. ANALYSIS

### a. Waiver of Sovereign Immunity and the Discretionary Function

Absent a waiver of sovereign immunity, the United States is generally immune from suit, precluding federal court jurisdiction. *Garling v. United States Envtl. Prot. Agency*, 849 F.3d 1289, 1294 (10th Cir. 2017) (citing *FDIC v. Meyer*, 510 U.S. 471, 475 (1994)). Thus, a claim for money damages against the United States can proceed only if Congress has waived sovereign immunity and consented to the action. *Aviles v. Lutz*, 887 F.2d 1046, 1048 (10th Cir. 1989). In the context of a tort claim against the United states, the FTCA waives sovereign immunity for

> personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred.

28 U.S.C. § 1346(b). But importantly, the waiver of immunity does not cover the "failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused." 28 U.S.C. § 2680(a). This is called the "discretionary function" exception to the FTCA's waiver of sovereign immunity. Under this exception, "the United States cannot be held liable for any damages resulting from its employees' acts or omissions unless a federal statute, regulation, or policy mandates a course of action and the employee fails to follow that mandated course of action." *Steele v. United States*, No. 09-cv-

01557CMACBS, 2010 WL 2501200, at *2 (D. Colo. June 15, 2010) (citing *Berkovitz v. United States*, 486 U.S. 531, 536 (1988)). This exception is "designed to protect policymaking by the executive and legislative branches of government from judicial second-guessing." *Garcia v. United States Air Force*, 533 F.3d 1170, 1176 (10th Cir. 2008) (internal citations omitted). A government employee's decision falls within this exception if it (1) "involv[es] an element of judgment or choice" and (2) is "based on considerations of public policy." *United States v. Gaubert*, 499 U.S. 315, 322–23 (1991). Both prongs must be met for the exception to apply. *Berkovitz,* 486 U.S. at 536.

Under the first prong, "an element of judgment of choice," "[c]onduct is not discretionary if a federal statute, regulation, or policy specifically prescribes a course of action for an employee to follow." *Clark*, 695 F. App'x at 383 (quoting *Garcia*, 533 F.3d at 1176). For the Court to find that the regulation is not discretionary, there must be some "fixed standard" for government employees to follow. *Flynn v. United States*, 902 F.2d 1524, 1531 (10th Cir. 1990). If a duty is neither mandatory nor clearly specified, it is discretionary, and the discretionary function exception applies even when the discretionary acts themselves constitute negligence. *Barnson v. United States*, 816 F.2d 549, 553 (10th Cir. 1987). "The existence of a regulation that allows a government employee discretion 'creates a strong presumption that a discretionary act authorized by the regulation involves consideration of the same policies which led to the promulgation of the regulations.'" *Clark*, 695 F. App'x at 387 (quoting *Gaubert*, 499 U.S. at 324). Thus, "[w]hen established governmental policy, as expressed or implied by statute, regulation, or agency guidelines, allows a Government agent to exercise discretion, it

must be presumed that the agent's acts are grounded in policy when exercising that discretion." *Id.*

If the first prong is met, the Court must then consider whether "that judgment is of the kind that the discretionary function exception was designed to shield." *Gaubert*, 499 U.S. 315, 322–23 (1991). "Decisions that require choice are exempt from suit under the FTCA only if they are 'susceptible to policy judgment' and involve an exercise of 'political, social, [or] economic judgment.'" *Cope v. Scott*, 45 F.3d 445, 448 (D.C.Cir.1995) (quoting *Gaubert*, 499 U.S. at 325)). If the judgment might be based on policy considerations, then the second prong is met. *Sydnes v. United States*, 523 F.3d 1179, 1185 (10th Cir. 2008).

### 1. Was the Decision Not to Warn Against the Danger of the Mine Shaft Discretionary?

Turning to the first part of the discretionary function test, Plaintiffs argue that the United States did not have discretion to allow the Mine Shaft to remain next to 456.1A in an unguarded and unmarked state. In support, Plaintiffs cite the Declaration of Gregory Smith ("Smith Decl."). (Dkt. #26-3.) Mr. Smith is a USFS employee currently serving as the Recreation, Engineering, Lands and Minerals Group Leader for the Arapaho & Roosevelt National Forests and Pawnee National Grasslands (the "Forest"), where the Mine Shaft was located. (*Id.* ¶ 1.) Mr. Smith concedes that the USFS is responsible for the maintenance of 456.1A. (*Id.* ¶¶ 6-8.) Moreover, Mr. Smith acknowledges that the policies governing road maintenance on USFS lands are set out in the Forest Service Manual (the "Manual"), the Forest Service Handbook (the "Handbook"), and the Forest Service Guidelines for Road Maintenance Levels (the "Guidelines"). (*Id.* ¶ 6.) Plaintiffs argue that the Mine Shaft meets the Manual's definition of "road damage," which is

defined as "[t]he effect of either natural or human-caused events which deteriorates the roadway, drainage, or structural components so they do not function as intended, or cannot be properly restored by currently scheduled maintenance." (Manual, § 7730.5, Dkt. #33-1 at 2.) The Manual requires the USFS to "[r]ectify any safety problems by making emergency repairs, or sign or close the road," and "[p]romptly notify commercial users, and the public when appropriate, about the nature of the damage." (*Id.* at § 7731.)

Plaintiffs also claim that that the Guidelines set forth the maintenance requirements for Maintenance Level 2 roads, which includes 456.1A. Specifically, Plaintiffs point to the following procedures:

- "[L]og out and brush" removal of the "traveled way" "to provide passage for high clearance vehicles."

- The shoulder is to be maintained for "access by high-clearance vehicles."

- "Remove or rampover slides and repair slumps as needed to provide access for high clearance vehicles and to control resource damage."

- Work to the roadside is required if "necessary to provide clearance for existing traffic." For instance, fallen trees may be left in place only "if not an obstacle to safe passage of intended traffic."

- "Install and maintain route markers. Maintain warning, regulatory, and guide signs, and other traffic control devices as warranted in the sign plan . . .."

(Resp., Dkt. #33) (citing excerpt from the Guidelines, Dkt. #33-2.) Plaintiffs contend that the USFS failed to follow these non-discretionary guidelines.

Finally, Plaintiffs argue that the USFS's misclassification of 456.1A as a Maintenance Level 2 Forest Service road was not a discretionary function. The USFS classifies maintenance of Forest Service roads by five levels, 1-5. (Guidelines, Dkt. #40-1 at 7.) Maintenance Level 1 roads are closed to motor vehicle use, while Maintenance Level 2 roads are maintained for high clearance vehicles. (*Id.*) Maintenance Levels 3-5 roads are maintained for passage by standard passenger cars during the normal season of use. (*Id.*) Plaintiffs note that although 456.1A is a dirt road in a rural area, it is heavily trafficked year-round, especially in the summer, and that overnight camping is allowed up to 300 feet from the centerline of road. (Compl., Dkt. #1 ¶¶ 37-39, 83.) In light of these facts, Plaintiffs maintain that the United States did not properly exercise its discretion in failing to repair 456.1A by removing the Mine Shaft.

Accepting *arguendo* the proposition that the Handbook, Manual, and Guidelines can be said to mandate a specific course of action regarding road maintenance, Plaintiffs' various arguments miss the mark for a simple reason: the Mine Shaft was not located on a USFS road. Plaintiffs explicitly acknowledge this. In their Complaint, they allege that the Mine Shaft was located immediately or directly *adjacent* to 456.1A. (Dkt. #1 ¶¶ 40, 84, and 89.) Similarly, at several places in the Response, Plaintiffs describe the Mine Shaft as being "next to" 456.A. (Dkt. #33 at 1, 4, and 9.) According to Trez Skillern, a USFS hydrologist and the Program Manager for the Environmental Compliance and Protection and Abandoned Mine Lands ("ECAP/AML"), the Mine Shaft was located approximately 20 feet from 456.1A. (Declaration of Trez Skillern ("Skillern Decl."), Dkt. # 26-2 ¶ 5.) At the Motion Hearing held on October 23, 2018, the parties referred the Court to a diagram of the section of 456.1A where the accident took place

which demonstrates that the Mine Shaft was not on the road. (Dkt. #43-2.) Thus, Lutz was not driving on a designated USFS road at the time of the accident.

Moreover, the Guidelines state that "[m]otorists should have no expectations of being alerted to potential hazards while driving" on Maintenance Level 2 roads. (Guidelines, Dkt. #40-1 at 34.) Logically, this would also preclude any expectations of being alerted to off-road dangers like the Mine Shaft. As to the road misclassification issue, Plaintiffs rely on *Soto v. US*, 748 F. Supp. 727 (C.D. Cal. 1990), which states "that while the decision to classify national forest lands into these two types of areas [i.e., "developed" or "dispersed"] is a discretionary function . . . the misclassification of a given site by the District Ranger is not such a policy decision." *Id.* at 730. However, that case did not involve the classification or misclassification of Forest Service roads. In a subsequent case in the same district that *did* involve Forest Service roads, the court concluded that "there is nothing in the Guidelines that requires USFS to classify its roads based on specific criteria or require that the USFS must maintain those roads pursuant to a fixed schedule or in a set way." *Mattle v. United States*, No. CV1210157JFWFFMX, 2013 WL 11328421, at *6 (C.D. Cal. Nov. 26, 2013). *See also Duke*, 131 F.3d at 1410 (the Manual and a supplement thereto "emphasize safety and appropriate warnings" but "are not specific enough to eliminate the Forest Service employees' choice regarding how to act in particular circumstances"); *Gonzalez v. United States*, 851 F.3d 538, 545 (5th Cir. 2017) ("[T]he relevant Manual and Handbook provisions contemplate an element of choice as to how USFS employees inspect and maintain the trails.").

The issue, then, is not whether the United States had a non-discretionary duty pursuant to the Manual or Guidelines to maintain and repair USFS roadways. *See Clark*, 695 F. App'x at 386 ("To circumvent the discretionary function exception, the mandatory duty alleged must be one whose breach bears a causal relationship to the Plaintiffs' injuries, thereby giving rise to their cause of action against the government."). Rather, the question is whether there was any federal statute, regulation, or policy that removes discretion with respect to guarding or warning of potential hazards posed by abandoned mine shafts on Forest Service land. Plaintiffs have failed to identify any such rule or policy.

In reaching this conclusion, the Court is guided by the decision of *Cleveland v. United States*, 546 F. Supp. 2d 732 (N.D. Cal. 2008). Like the instance case, *Cleveland* involved an individual who died on USFS land after driving into an abandoned mine shaft. There, the mine shaft was located at the top of an embankment, approximately 20 feet from its base at the side of the trail. *Id.* at 738. At the time, the mine shaft was not fenced off or enclosed, or signed or marked in any visible way. *Id.*

At the first step of the *Berkovitz* test, the *Cleveland* court determined that the plaintiffs offered "no evidence of any statutory or regulatory mandate" that required the USFS "to make a search of Forest Service lands to identify all possible hazards, to engage in the process of identifying and seeking funding for permanent closure of possible safety hazards, or to install fencing around mine features slated for permanent closure." *Id.* at 753. After a lengthy analysis, the court concluded that "in the absence of any specific mandatory laws, regulations, or policies, the Forest Service's decisions

regarding how to mark roads and trails and how to warn of hazards certainly involved the exercise of discretion." (*Id.* at 758.)

Plaintiffs attempt to distinguish *Cleveland* because the driver in that case purposely drove off-road and so the question of whether road maintenance or warnings is discretionary was not at issue. (Errata to Resp., Dkt. #34 at 2.) This is unpersuasive. It is undisputed that the vehicle driven by Mr. Lutz was not on a designated road either, making *Cleveland* distinguishable only in that Mr. Lutz, unlike the driver in *Cleveland*, did not mean to leave the Forest Service road. The Court fails to see how a driver's intent or state of mind alters the discretionary function analysis.

Because the first prong is met, the Court turns to whether the United States decision to not guard or warn against the potential hazards posed by abandoned mineshafts on USFS land is susceptible to policy judgment and involves an exercise of political, social, or economic judgment.

### 2.    Was the United States' Conduct Susceptible to Policy Analysis?

Turning to the second *Berkovitz* prong, because the Court must determine whether the government's conduct was susceptible to policy consideration, it must first define that conduct. Plaintiffs argue that the Court should analyze the USFS's specific decision to not warn or guard against the mine shaft at issue here; they claim that "the United States erroneously conflates *general* policy decisions regarding the entire volume of USFS lands with its decision regarding this one hazard (the Mine Shaft) on 456.1A." (Resp., Dkt. #33 at 11) (emphasis in original.) However, under *Gaubert*, "[f]or a complaint to survive a motion to dismiss, it must allege facts which would support a finding that the challenged actions are not *the kind of conduct* that can be said to be

12

grounded in the policy of the regulatory regime." 499 U.S. at 324–25 (emphasis added). In making this analysis, the Court "operate[s] at a higher level of generality than plaintiffs argue for, asking categorically (rather than case specifically) whether the kind of conduct at issue can be based on policy concerns". *Sydnes*, 523 F.3d at 1185. Accordingly, the Court agrees with the United States that isolating the policy considerations to any one particular mine shaft is not appropriate. Instead, the question that must be answered is whether the government's failure to warn or guard against the dangers posed by abandoned mine shafts on USFS land was part of a policy decision.

In this case, there is affidavit evidence that there are thousands of abandoned mine shafts on USFS land in the Rocky Mountain Region, and well over 1,300 in the Forest itself. (Skillern Decl., Dkt. #26-2 ¶ 4.) The USFS has implemented a process by which hazardous abandoned mine shafts are identified and the hazards mitigated. (*Id.*) The decisions about which mine shafts are filled or otherwise mitigated is based on discretionary considerations related to the available budget and various environmental concerns, among other factors. (*Id.*)

The Tenth Circuit has vacillated from case to case in deciding whether the government's justification for failing to warn of known hazards in national parks, recreational areas, or wilderness areas satisfied the second element of the discretionary-function test. *See Clark,* 695 F. App'x at 387. For example, in *Boyd v. United States*, 881 F.2d 895 (10th Cir. 1989), the court found that the alleged failure to warn swimmers of dangerous conditions in a popular swimming area did not implicate any social, economic, or political policy judgments. *Id.* at 898. Similarly, in *Smith v. United States*, 546 F.2d 872, 877 (10th Cir. 1976), the Tenth Circuit held that the failure

to warn against the hazards of super-heated thermal pools in Yellowstone National Park could not rationally be deemed an exercise of a discretionary function. *Id.* at 877. And in *Duke v. Dep't of Agric.*, 131 F.3d 1407 (10th Cir. 1997), where a young camper was injured when a boulder rolled over his tent, the Tenth Circuit held that "the government has not shown how failure to warn or protect from the danger of a boulder rolling down the man-made slope implicated political, social, or economic decisions of the sort that the exception was designed to protect." *Id.* at 1412 (quotation marks omitted).

However, there is no doubt that a failure to warn still may be a policy decision or part of a policy decision protected by the discretionary function exception so long as it is grounded in social, economic, or political judgments. *See Zumwalt v. United States*, 928 F.2d 951, 955 (10th Cir. 1991). In *Zumwalt,* the plaintiff was injured after falling into an unmarked cave at a national park. *Id.* at 951. Finding that the absence of warning signs was part of the overall policy decision to maintain the park's trail in its wilderness state, the court distinguished *Smith* and *Boyd*:

> In relying on this court's decisions in *Smith* and *Boyd*, Zumwalt asserts correctly that in each of those cases we held that the failure to warn of hazardous conditions did not involve any social, economic, or policy judgment. *See Boyd*, 881 F.2d at 898; *Smith*, 546 F.2d at 877. Zumwalt is mistaken, however, in contending that any failure to warn falls outside the scope of the discretionary function exception. In both *Smith* and *Boyd*, the government's failure to warn was not connected to the policy decision which created the hazard. In *Smith*, the decision not to post warning signs near thermal pools was not connected to the decision to leave the area undeveloped. *Smith*, 546 F.2d at 876–77. In Boyd, the alleged failure to warn swimmers of dangerous conditions was not shown to be part of the policy decision not to zone a particular area. *Boyd*, 881 F.2d at 898. Unlike the decisions not to warn in *Smith* and *Boyd*, the decision in the instant case not to place additional warnings on the Trail cannot be divorced from the policy decision to maintain the area in its wilderness state; it was a "branch of the same tree." The decision to leave the Trail in its wild state, whether explicit or implicit, related directly to the overall scheme set out in the Management Policies. That overall scheme directed the Park Service to

maintain the Monument in its natural state. A decision that is a component of an overall policy decision protected by the discretionary function exception also is protected by this exception.

*Id.* at 955.

In this vein, numerous Tenth Circuit decisions have applied the discretionary function exception in duty to warn cases. *See Clark*, 695 F. App'x at 387-88 (collecting cases). Generally, "[i]f the decision not to give a warning flows from a broader policy decision concerning design or maintenance, then the failure to warn may be viewed as a policy-based exercise of discretion." *Id.* at 388. It appears that the difference in these various duty-to-warn decisions may turn on the quality of supporting evidence presented by the United States about the policy considerations underlying the alleged failure to mitigate or warn of a hazard.

In this case, there is no shortage of supporting evidence. The United States has offered a litany of facts and policy considerations at play in deciding how and in what order the dangers of mine shafts should be addressed. The USFS manages 192,916,966 acres of public land. (Declaration of Scott Ludwig ("Ludwig Decl."), Dkt. #26-1 ¶ 4.) The Rocky Mountain Region consists of 22,053,223 acres of land, and the Forest where the Mine Shaft was located comprise 1,598,221 acres. (*Id.* ¶ 5.) In administering and managing the Forest, the USFS must balance competing policy objectives, and is subject to numerous federal statutes. There are at least 11,500 abandoned mine features have been identified in the Rocky Mountain Region. (*Id.* ¶ 11.) The "inventory and mitigation" of abandoned mines is governed by ECAP/AML. (*Id.* ¶ 10.) Funding for mitigating safety hazards associated with abandoned mines is limited and competes with funding for other USFS programs and priorities. (*Id.* ¶ 13.) An AML physical safety hazard mitigation project

has several steps and includes the consideration of safety concerns, surveys, environmental reviews, and public notice and comment. (Skillern Decl., Dkt. # 26-2 ¶ 4.) The USFS contracts with CDRMS to undertake the closure of abandoned mines. (Ludwig Decl., Dkt. #26-1 ¶ 20.) Since 2008, an average of 85.8 abandoned mine features and associated hazards have been mitigated per year. (*Id.* ¶ 21.)

After considering the evidence offered by the United States, the Court finds that the USFS's decisions regarding mitigating and warning of the dangers posed by abandoned mines implicate resource allocation, environmental concerns, wilderness considerations, and public safety. In other words, deciding which mine shafts to close first or to warn the public about are administrative decisions grounded in social, economic, and political policy. *See Cleveland*, 546 F. Supp. 2d at 768 ("[T]he determination of how to identify and warn of the potential hazard posed by the Union–Zaar mine shaft plainly involved balancing of competing public policies, and was not controlled by safety considerations under an established policy.").

In the *Duke* case, which involved the boulder hitting a camper's tent, there was an absence of such policy-related evidence. Indeed, the government in *Duke* explicitly told the court that "no economic factors influenced the decision or nondecision" to warn the public of the known risk of falling boulders in a camping site. 131 F.3d at 1411. Recognizing that the "bulk of the cases holding that the discretionary function exception applied involved readily identifiable public policy decisions," the court in *Duke* followed cases like *Smith* and *Boyd* because in those cases, "the court could not perceive in the record before it any significant social, economic or political policy in the action or inaction that allegedly contributed to the injury giving rise to the lawsuit." *Id.* Here, the

Court does find significant policies goals are at issue and will not second guess administrative decisions as to which hazards the USFS should use its limited resources to address. [4]

In sum, the Court finds that Plaintiffs' claims fall within the discretionary function exception of the FTCA and recommends that they be dismissed for lack of subject matter jurisdiction.[5]

## b. CRUS

Even if the discretionary function exception did not preclude the Court from exercising jurisdiction, Plaintiffs' claims would still be subject to dismissal under the FTCA if the circumstances are such that, under Colorado law, the United States, in the same manner and to the same extent as a private individual, would not be held liable. *See* 28 U.S.C. § 1346(b). Here, in addition to claiming that the discretionary function exception bars suit under the FTCA, the United States asserts that the CRUS forecloses any liability.

---

[4] It is also worth noting that both *Smith* and *Boyd* predate the Supreme Court's decision in *Gaubert*.

[5] This conclusion is reached with some reluctance. The Court acknowledges the monumental losses suffered by Plaintiffs and recognizes that this decision means that they cannot recover for deaths that potentially could been prevented. Ultimately, however, the thrust of the Complaint, and the associated policy implications, are that the USFS should be held responsible for any accident that occurs in abandoned mine shafts known to be located on USFS land, whether they are on a designated roadway or not. Given the tens of thousands of abandoned mine shafts located on USFS land, and the limited resources available to address these hazards, the discretionary function exception must apply in these circumstances. More bluntly, under the current statutory scheme, it is the recreating public that bears the risk of damages associated with the many abandoned mine shafts found on USFS land. The public should not expect to be compensated by the government for injury or death that results from these dangerous features.

Colorado's Premises Liability Act ("PLA"), Colo. Rev. Stat. § 13-21-115, was enacted "to promote a state policy of responsibility by both landowners and those upon the land as well as to assure that the ability of an injured party to recover is correlated with his status as a trespasser, licensee, or invitee." Colo. Rev. Stat. § 13-21-115(1.5)(a). However, in order to encourage property owners to make their land available for public recreational use without the fear of lawsuits, the CRUS provides that a landowner who, without charge, invites or permits any person to use his or her property for recreational purposes does not "[c]onfer upon such person the legal status of an invitee or licensee." Colo. Rev. Stat. § 33-41-103(1)(b). Thus, the CRUS places the risk of injury for recreational activity upon the recreational user, subject to certain specifically enumerated exceptions. Only one such exception could potentially apply to this case: under the CRUS, a landowner is not protected from liability when it "willful[ly] or malicious[ly] fail[s] to guard or warn against a known dangerous condition, use, structure, or activity likely to cause harm." *Id.* § 33-41-104(1)(a). Plaintiffs argue that because the United States knew about the dangerous condition of the Mine Shaft and took no steps to mitigate the hazard or warn of its existence, it acted "willfully" and can be held liable under the CRUS.

Under the FTCA, the United States is entitled to the protection of state recreational use statutes, including the CRUS. *Evert v. United States*, 535 F. App'x 703, 707 (10th Cir. 2013). *See also Kirkland v. United States*, 930 F. Supp. 1443, 1446 (D. Colo. 1996) (listing cases). However, because the CRUS's limitation on liability is in derogation of Colorado law, it is narrowly construed. *Nelson v. United States*, 256 F. Supp. 3d 1136, 1157 (D. Colo. 2017) (citing *Ducey v. United States*, 713 F.2d 504, 510

(9th Cir. 1983)). Conversely, the "willful" exception at issue must be broadly construed. *Id.*

There is little to no Colorado case law interpreting and applying the CRUS. However, in *Nelson*, Senior District Judge Wiley Y. Daniel recently examined the statute in painstaking detail. *See* 256 F. Supp. 3d at 1149-68. In that case, the plaintiff was seriously injured in a bicycle accident after riding into a sinkhole/washout on a bike path located at the United States Air Force Academy. *Id.* at 1140. After a bench trial, Judge Daniel initially found the United States liable and held that CRUS immunity did not apply because the Air Force Academy did not intend for the bike bath to be used for recreational purposes. *Id.* The United States appealed and the Tenth Circuit reversed, finding that the CRUS applied and that the plaintiff was a permissive user of the path. *Nelson v. United States*, 827 F.3d 927, 933 (10th Cir. 2016). The case was remanded to determine whether the "willful or malicious" exception applied. *Id.* Ultimately, Judge Daniel determined as a matter of fact that there was a willful failure by the United States to guard or warn against a known dangerous condition likely to cause harm. *Nelson*, 256 F. Supp. 3d at 1168 (D. Colo. 2017).[6] Given the dearth of relevant authority, the Court is guided by Judge Daniel's careful analysis.

First, the Court must first determine whether the Mine Shaft was a known dangerous condition likely to cause harm. Judge Daniel defined "dangerous" for the purposes this section as follows:

> "Dangerous condition" is not defined in the CRUS, but a plain meaning can be ascribed to that term. The dictionary defines "dangerous" as "exposing to or involving danger; able or likely to inflict injury or harm."

---

[6] Judge Daniel's decision is currently on appeal. *See Nelson v. United States*, Case No. 17-1388 (10th Cir.).

https://www.merriam-webster.com/dictionary/dangerous. "Danger" is defined as "exposure or liability to injury, pain, harm, or loss." *Id.* The Colorado courts have confirmed this meaning of "danger." *See Fleury v. IntraWest Winter Park Operations Corp.*, No. 13CA0517, —— P.3d ——, – ——, 2014 WL 554237, at *3 (Colo. App. Feb. 13, 2014) (the common meaning of danger is a "[p]eril; exposure to harm, loss, pain, or other negative result") (quoting *Black's Law Dictionary* 450 (9th ed. 2009)).

Also, the Colorado legislature defined "[d]angerous condition" in the Colorado Governmental Immunity Act as "a physical condition of a facility or the use thereof that constitutes an unreasonable risk to the health or safety of the public . . .." Colo. Rev. Stat. § 24-10-103(1.3). I adopt these definitions of the word "dangerous".

*Id.* at 1136.

The Court likewise adopts this definition, and has little problem determining that, accepting Plaintiffs' allegations as true, the Mine Shaft was a dangerous condition. The Complaint alleges that the abandoned and exposed Mine Shaft was ten by twenty feet in diameter and 22 to 25 feet deep. (Compl., Dkt. #1 ¶¶ 56-58.) It is undisputed that the Mine Shaft was large enough for a vehicle to drive into, and deep enough that the impact on hitting the bottom proved fatal as to Ms. Ball and Mr. Kim. (*Id.* ¶ 65.) Plaintiffs further claim that the USFS knew that the Mine Shaft was adjacent to 456.1A, which was a busy road that was used—day and night and in all seasons—by cars and campers. (Resp., Dkt. #33 at 13.) Thus, Plaintiffs adequately allege that the Mine Shaft was dangerous.

The Court also finds that the allegations of the Complaint are sufficient to allege that the Mine Shaft was likely to cause harm. "Likely" means a high probability of occurring, or "in all probability", and requires more than a potential hazard. *Nelson*, 256 F. Supp. 3d at 1151. In *Nelson,* Judge Daniel found that

a sinkhole on a recreational path with significant size and depth, that covers the entire width of the path and is hard to see, and is on a path that

the Academy knew was used by bicyclers, would have a high probability
of causing harm to a person riding their bicycle on the path.

*Id.*

In this case, Plaintiffs' allege that there was a fork in the road that directed drivers
straight into a dangerous condition. (Compl., Dkt. #1 ¶ 40-44.) Taking these allegations
as true and viewing them in the light most favorable to Plaintiffs, the Court concludes
that Plaintiffs have alleged that the Mine Shaft was more than a mere potential hazard;
rather, it presented a high probability of harm to those using 456.1A.

Finally, a landowner is only liable under the CRUS if its failure to guard or warn
against a known dangerous condition likely to cause injury is "willful or malicious." Colo.
Rev. Stat. § 33–41–104(1)(a). Plaintiffs do not allege that the United States acted
maliciously. (Resp., Dkt. #33 at 13, n. 5.) Therefore, the Court will focus on whether the
United States' failure to warn or guard against the Mine Shaft was "willful."

In *Nelson*, Judge Daniel took pains to distinguish "willful," which is not defined in
the CRUS, from "willful and wanton," a term of art with a specific meaning under
Colorado law:

> I find that the legislature meant to use the term "willful" as compared to
> "willful and wanton", and find that since it did not define the term willful in
> the CRUS, it meant for "willful" to have its plain and ordinary meaning. I find
> that this requires that an action be taken "voluntarily, purposefully and with
> a conscious disregard for the consequences of the act". Willfulness does
> not, however, require that a government employee be consciously aware
> that his acts or omissions create danger or risk to the safety of others, or
> that he intended to harm another.

256 F. Supp. 3d at 1159–60 (D. Colo. 2017) (citations omitted). The Court adopts this
definition of "willful."

Applying this standard, Judge Daniel found that the Air Force Academy's conduct in failing to guard or warn users of the path against the dangerous condition it knew existed on its property was willful. *Id.* at 1161. He stated as follows:

> Given the Academy's knowledge of the path and its recreational use, the bicycle signs that allowed people to infer that the path was open to public use, the Academy's failure to act when CDOT offered to remove at least one of these signs, and the erosion issues occurring in that area, I find that the Academy must be deemed to have refused to weigh the consequences of the recreational use of the path and whether someone could be injured on it.

*Id.* at 1162.

The Court finds that Plaintiffs have adequately pled that the United States acted in a similarly willful fashion with respect to failing to warn of the dangers of the Mine Shaft. Plaintiffs allege that the USFS knew about the Mine Shaft and that it was immediately adjacent to 456.1A; that the USFS permitted year-round use of 456.1A and that camping occurred within 300 feet of the road; that vehicles travelled the road at night; and that USFS personnel showed the Mine Shaft to CDRMS personnel for the purpose of identifying the Mine Shaft for reclamation/closure. (Resp., Dkt. #33 at 14-15.) These allegations are sufficient to state a claim for liability under the CRUS.

Accordingly, if Plaintiffs' claims were not barred by the discretionary function exception to the FTCA's waiver of sovereign immunity, they would survive the United States' challenge under the CRUS, at least at the motion to dismiss stage.

### c. Wrongful Death Claim and Survival Action

Finally, Plaintiffs bring a wrongful death claim under Colo. Rev. Stat. § 13-21-202, and a claim under the survival statute, Colo. Rev. Stat. § 13-20-101. Both claims must be dismissed.

Colorado's Wrongful Death Act allows a person's heirs to recover damages for the wrongful death of that person. Colo. Rev. Stat. § 13-21-202. However, that right "does not arise from a separate tort, but instead is wholly derivative of the injury to the decedent." *Steedle v. Sereff*, 167 P.3d 135, 140 (Colo. 2007). Because Plaintiffs' PLA claim is barred by sovereign immunity, the derivative wrongful death claim cannot be maintained.

Next, Colo. Rev. Stat. § 13-20-101 provides that "[a]ll causes of action, except actions for slander or libel, shall survive and may be brought or continued notwithstanding the death of the person in favor of or against whom such action has accrued." Like the Wrongful Death Act, the survival statute does not provide for an independent basis of liability. Instead, "[t]he personal representative of the decedent's estate . . . stands in the decedent's shoes in a state survival action." *Espinoza v. O'Dell*, 633 P.2d 455, 466 (Colo. 1981). Because the Court does not have subject-matter jurisdiction over the decedents' FTCA claims, Plaintiffs' Fourth Claim for Relief must be dismissed.

## IV. RECOMMENDATION

**WHEREFORE**, for the foregoing reasons, it is hereby **RECOMMENDED** that Defendant United States of America's Motion to Dismiss (Dkt. #26) be **GRANTED** under the doctrine of sovereign immunity.

**IT IS ORDERED that pursuant to Fed. R. Civ. P. 72, the parties shall have fourteen (14) days after service of this Recommendation to serve and file any written objections in order to obtain reconsideration by the District Judge to**

whom this case is assigned. A party's failure to serve and file specific, written objections waives de novo review of the Recommendation by the District Judge, Fed. R. Civ. P. 72(b); *Thomas v. Arn*, 474 U.S. 140, 147-48 (1985), and also waives appellate review of both factual and legal questions. *Makin v. Colo. Dep't of Corr.*, 183 F.3d 1205, 1210 (10th Cir. 1999); *Talley v. Hesse*, 91 F.3d 1411, 1412-13 (10th Cir. 1996). A party's objections to this Recommendation must be both timely and specific to preserve an issue for de novo review by the District Court or for appellate review. *United States v. One Parcel of Real Prop.*, 73 F.3d 1057, 1060 (10th Cir. 1996).

Dated: November 26, 2018
Denver, Colorado

N. Reid. Neureiter
United States Magistrate Judge